Please call the first case. 090252 Marcy Belmont v. Belmont Harbor Home For the Appalachians. Allen Ryan, R-H-I-N-N-Y for Ms. Garner. Appalachian. Robert Shearer for the defendant Appalachian Belmont Harbor Home Development. It's a, we give each side 15 minutes, but we don't look at our watch. So if you have something more to say, please say it. Just don't get redundant. Keep it interesting. We've read the briefs. We're familiar with the facts. So we'd appreciate it if you get to your strongest points first. If you would speak up so we can hear you. Speak into the microphone or near the microphone since we are tape recording or digitally recording these proceedings. At any time you're ready, Mr. Ryan. Thank you, Your Honors. I would like to reserve five minutes for rebuttal. In this case, the real issues that we've raised deal with whether the circuit court went outside the contract that was signed by the parties to impose an award for damages for reconstruction of a unit in a condominium building and to impose a $5,000-plus sanction against Ms. Goldberg. With regard to the reimbursement, it's our contention that the parties' contract specifically set out what extras were. And there was a procedure not only for approving extras, but also what the extras would entail. And if you even look at the brief of Belmont Harbor in this case, you see even at the very first page they refer to extras including certain items. They refer to a kosher kitchen. The contract doesn't talk about a kosher kitchen, but there were to be two kitchens in the unit. If you look at the second page of their brief, and they're again- What would you say then, Mr. Ryan, that the double kosher kitchen would be an extra even though it may not have been defined as such, or are you saying that it was defined as such? Well, the kitchen itself is not kosher. It was structured to allow the person moving in to set it up to be kosher. I don't want to necessarily get into all of the rules. They're quite complicated. But basically, the basic premise is you separate meat dishes- I don't care which kosher. The question is, was it an extra? Are you conceding that the double kosher kitchen was an extra or not? It was not an extra because it was included in the original plan. And the contract calls for extras to be changes from the original plan. Let me get this straight. If it's one unit and there's two kitchen sinks, unless you're orthodox almost, who would buy it? Isn't that sort of a disadvantage to most people? It potentially can be a disadvantage, but it was agreed upon by the builder, Belmont Harbor, before the building was ever constructed. They agreed upon it. They should have known there was a risk because they were, you know, part of the contract. They signed a contract that had a mortgage contingency. And not only did they accept that risk, but even after Ms. Goldberg could not get a mortgage and the sale did not close, Belmont Harbor still marketed the property as constructed. For them, for this one person or family? Well, it was constructed according to her wishes, and it was negotiated to be constructed according to her wishes. But after it was apparent that the deal would not close and after Belmont Harbor sought to terminate the contract and declare a default, they still continued to market that unit for a year and a half to two years. Well, it was to the advantage of Ms. Goldberg, wasn't it? Because they were trying to mitigate damages. Had they been unable to sell it, that creates damage for Belmont Harbor, which they'll seek against your client, would they not? It was not to the advantage of Ms. Goldberg because there were no damages. There was a mortgage contingency provision. The mortgage was not obtained, as found by the circuit court, and the contract was terminated pursuant to the mortgage contingency provision. And the mortgage contingency provision is very clear that after the contract is terminated, it is only extras that are to be put into the property while the contract is in effect that Ms. Goldberg can be charged. So I dispute that there were damages at all. Yes, Your Honor. So that I'm clear, counsel, your position is that these two kitchens were included in the original contract so it wasn't an addition, a deletion, or a substitution from the contract. Is that your position? Correct. When they negotiated, at the very beginning when they negotiated, there was a form architectural plan for all of the apartments or all of the units in the building. The contract called for the architect to redesign this particular part of the building to provide for a single unit where two had originally been planned. So you're basically saying it's not in the contract. If it is in the contract, sometimes you can enforce it. What I'm really liking, though, is the escrow. What's payable out of the escrow? You're saying the same thing. I'm saying what is payable out of the escrow was the extras that Ms. Goldberg ordered and signed off on. The original purchase price took into effect what the cost of construction would be based on the plans as changed before the contract. Basically, the contract was terminated. Correct. And then we're saying what comes out of the extras. Under the terms of the contract, and I believe it's Section 25. So you're strictly going by the contract. And when she ordered something orally, because I guess they couldn't get together to sign the extra, you're saying that's not in the contract, it should not be taken out of escrow? Okay. Forget what item was not signed. Okay, there were only about $4,000 in unsigned extras. The argument on the behalf of Ms. Goldberg is they were not approved as required by the contract. And if you look at the proceedings and the statement of facts, there was this ongoing interplay between the parties. And as a matter of fact, even as late as June of 2003, there were still signed change orders which were extras. And Ms. Goldberg acknowledges that those extras, which total about $11,000, should be subtracted from the escrow. There was another $4,000 that there is a dispute about whether she waived the requirement to sign the change order because she was aware that this work was being done. But, again, that's only $4,000 worth of work. We contend there was not a waiver because there was no intent to specifically approve those. The arguments made at the circuit court and the evidence showed that there was an assumption that because she didn't object to them that she had waived her right to sign off on these extras. But the main part of the dollar amount that is in controversy is $46,000 for changing the building a year and a half to two years after the deal was terminated by Belmont Harbor. Now, Belmont Harbor and Ms. Goldberg had a dispute about whether the contract was null and void because of her inability to get a mortgage. Ultimately, the circuit court found that it was. But we're saying that what was done, the work that was done a year and a half to two years later after Belmont Harbor acknowledges that they terminated the contract cannot be an extra. And under the contract, the only things to be subtracted from the extra are for the extras. We all face risks in everything we do. And in some cases, you can contract those away. Belmont Harbor could have, realizing there was a contingency, a mortgage contingency provision in the contract provided that in the event the sale does not close and we have to change the structure of the building to make it more marketable, that Ms. Goldberg would pay for that. They could have done that, but they didn't. And therefore, they assumed the risk that if the mortgage contingency prevented closing, that they would have the property as they agreed to construct it when they signed the contract. They did not contract that assumption of risk away. They are trying to get the court to go back years later and correct their mistake in drafting the contract not to provide for that contingency. They were aware of the risk, and they took it. The contract itself, did that call for two signatures to take anything out of the escrow account? I don't believe that's specifically stated in the contract. I think the contract just said the money would be deposited into the escrow. And let me address what I think was of concern to the circuit court. Ms. Goldberg should not have taken the money out of the escrow. I clearly acknowledge that was a mistake on her part. A mistake? She filed a motion to get the money out, so she knew. She filed a motion before she took the money. She wanted it released and hold it apart, I imagine. The bank made a mistake? She took advantage of it? Yes, she did take advantage of the bank's mistake. But she knew it was wrong not to ask the court. Yours would be a very intelligent person. So she went to the bank with or without some call, and she took the money, even though she knew it should have been court-approved. How can you explain that? I cannot explain that other than she ultimately returned it. She did not. She returned $68,000. She returned what the court ordered her to return, which was the $68,000. I'm sorry, I didn't find that order. I'm sorry. I apologize. The court ordered her to return only $68,000? In the court's order of May 30th, 2008, C-5, in the record A-5 in the appendix to our brief, the court, this is the final order. Plaintiff shall pay the defendant $68,028.03. So the court ordered before, when the court, Judge Markowitz? Yes. When the court said there's money missing from the escrow, but only returned $68,000? Initially, the court ordered her to return the money. She kept asking for extensions, asserting that she did not have sufficient funds. Ultimately, though, what the judge ordered is the $68,000. And what did he order in the first order? What did he order the first time when he made that order? The first time he ordered to return the money by a certain date. The total amount. The total amount. $25,000. But that was an interlocutory order. Ms. Goldberg asked for a series of extensions. She only returned $68,000. But the court, the court specifically kept extending the time, and ultimately We'll hear from the other side about that. Okay. And you have plenty of time for, do you have anything else you want to say right now? Well, the only thing I want to say, I will concede that Ms. Goldberg should not have taken the money out. But that's different than whether she violated a court order and whether she should be sanctioned for that. And the court did impose a sanction of $5,000. And you're holding on to reconstruct two separate units should not be taken? Under the contract, it should not be taken. There was no legal provision, no legal theory that justified that because there was no breach. The contract only provided for deducting extras from the earnest money. And Belmont Harbor assumed the risk when they did not put some provision in the contract to address the issue, that if the sale did not go through because the mortgage contingency was not fulfilled, that they would have the property as well. So that's basically two units combined into one. Thank you. We have plenty of time for replies as well. Mr. Shearer. Please support. Justices, this building that's in question is a seven-story building. The seventh floor is made up of two penthouses. The other six floors are set up for four apartments per floor. This deviation structural change requested by Ms. Goldberg was a huge change. And because of that, the developer, Mr. McCauley, who's sitting here, requested a 10% escrow deposit. Ms. Goldberg wanted to put down 5%, but Mr. McCauley recognized that these construction changes, these structural changes were huge. He wanted to provide for the possibility that he'd be stuck with this apartment that was so unique that he was afraid he could not resell it. The initial contract contains an exhibit D1, which points out it's attached to my brief in the end. It identifies as purchase agreement extras the unit floor plan for combined units. This was actually designated in the original contract as an extra, and Judge Barkowitz, based on that, determined that the two combined units was an extra to begin with because it deviated so substantially from the original floor plan. But it didn't use the word extra, right? And there's a definition elsewhere in the contract which does not define the fact that the uniqueness of this construction, that she had what was included was the pass-throughs and the different walls, but not the idea of it. And it also covers the contracts with the architectural drawings. But under the phrase extras, it didn't define the idea of putting the two apartments together. Well, Judge, I can show you. It is labeled as an extra. Page 23 of the appendix? Yes. Well, unit floor plan for the architectural plans, the seller shall provide some of $2,500 for that expense. Buyer shall be responsible for any remaining sums. Buyer shall be responsible for the following extras or upgrades. Price of combined cabinet system, water piping system, wire tristeria. That doesn't say about combining the two units. But again, your argument is it doesn't – while it's not as defined as extras, even though you're reluctant to say that, since the initial contract does say these are two units we're putting together, it just makes sense that certainly the else would be unnoticed. This is going to cost money, and it's unique. And therefore, it's fair and right that the builder not have to take this loss, which was incurred as a result of the failure to perform. Although, based on her fact she couldn't get a mortgage, he should not bear it alone. Yes. Going back, if I may, Mr. Scherer, the fact that Mr. McCauley had the foresight to say this could go – I need 10% because this is different. This is unique. Right. Wouldn't that also indicate that he was concerned, and correctly so, obviously, not just in hindsight, that this may go south, that he was incurring more of a risk himself as a builder if this didn't go through. And so, therefore, doesn't it in some way help Mr. Ryan's argument that in addition to asking for 10% instead of the normal 5%, Mr. McCauley could have said, and in here I want you to say, I'm going to add it among the extras, or a separate sentence, I'll work towards a sentence to say, you're going to be liable for the reconstruction of splitting up these two units into one because I can't take that kind of risk. Well, I do agree he could have put that language in the contract, but I think what Judge Barkowitz was attempting to do is almost a rescission here where he was trying to put the two parties back to the position that they were in before the contract was entered into. And given the amount of judgment that he awarded the defendant, I mean, this escrow count adequately covered it, although we did ask for more than the escrow amount. Speaking just for myself, I couldn't agree with you more. That's exactly what Judge Barkowitz was doing. But the question is, can he do that? There's no question when you look at the amount of the money that Goldsberg was able to put in, this happens to be equal to the nickel of the amount of the judgment entered by Judge Barkowitz. There would be a clue that Judge Barkowitz is trying to, it's not rough justice, but do the right thing, frankly. Clearly this is bought from the facts. She owns three different large condo units, you know, live in one. That's odd. And why should Mr. McCauley take the risk? And I guess the answer is because contract law sometimes requires that. And so that's the argument of Mr. Ryan is that, well, the contract law doesn't allow justice. And the question is, does it? How here, what contract law would defend what Barkowitz did? Well, in terms of the counterclaim, previous counsel, before I got into the case, raised a quantum meroit argument. And I think that this follows very succinctly the type of analysis that you would do under a quantum meroit defense. So I think that it can be justified that way. And under that Loves Park case, they obviously repudiated the contract in July 11th, I believe, of 2003. And so Mr. McCauley had the option of claiming quantum meroit. And it's gone back and forth whether or not this contract was null and void. I think Judge Barkowitz said it was null and void. Then he said it was still in existence. He was going to enforce this extra provision. The mortgage failure. Yes. So I think that it can be justified that way. As to these unsigned extras, certainly the extras for the flooring, the cabinets, and things like that, they had to be signed. And they were signed by Ms. Goldberg. What she's complaining about are these kind of foundational work that is necessary to implement the entire scheme or the entire plan that she's redrawn for these two units. I think specifically they objected to the plumbing work and the electrical work and the wall work that was done to do the pass through so you could go from one kitchen to the other. So, I mean, she's generally, when she signed the contract on November 17th of 2001, she's agreed to those structural changes. And the developer is not going to run back to her when they have to reroute piping or electrical work to get a signed change order. Again, speaking just for myself, I wouldn't worry about the $4,000 she has for the two kitchens. The electricians are there. The plumbers are there. They better do the work. They're there. It costs lots and lots of money extra. The two concerns, it seems to me, are the reconstruction costs in excess of $40,000 to take apart these two units and the $5,000 taken out of the interest, taken out of the ESCO to cover loss of interest. And the concern I have with that is apparently a little different than Justice Murphy's. My problem on that is the amount of money that was asked for in that. So if you look at the period of time from the time she took the money away to the time it was paid back, or at least the portion that she returned was paid back, that interest was substantially lower, near $1,100 or something like that as opposed to $5,000. And so under what theory could Judge Barkowitz do what he did other than doing the right thing? Well, I think he could do this under the theory that there was an implied order that she would keep the since she filed the lawsuit that she would keep this money in the ESCO account and not touch it. She went in just prior to the pretrial. She filed a motion that she be allowed to have all the money in the account. Apparently she never motioned that up for hearing. She made an oral motion during the pretrial, which took place, I guess, on January 25th of 2007 and January 30th of 2007, that she be allowed to have all of these funds. Judge Goldberg denied this. February 22nd, which is, well, six weeks later, she's taking these monies out of the account. She absolutely did. Absolutely she did that. And then we have a hearing on this matter on November 15th, and she makes an opening statement where she's complaining about the interest that these monies supposedly are making in the ESCO account, knowing full well that she's already removed it. I mean, I think she could be sanctioned for that. But based on what authority? That's the point. What's the authority? Well, I think it's the violation of the implied order that she not remove these funds. It also breaches the contract, I feel, that those funds were supposed to remain there. The other thing, too, is that she's a real estate broker amongst many other professional licenses that she has. This ESCO account was set up as a broker's ESCO, which means that only Mr. McCauley was the signatory on this account. She knew full well. She's invested in multimillion-dollar properties and bought and sold these. She's got a real estate broker's license. She knew exactly what she was doing. She initially claimed that they said that because there was no activity on the account, that she had to go in there and take it out. She could have put a dollar into the account. So I know it's somewhat nebulous as to breaching trial court's orders. I mean, it's not well defined as the contempt or the Supreme Court Rule 219 sanctions for discovery violations. But there is case law out there that says that if the court has the inherent power to sanction somebody for violating its court order, I think the implied order is that that money stayed there until Judge Barkowitz made a decision one way or the other. And, plus, she never returned the money. And when she came in and asked for it, Judge Barkowitz was very lenient with her. When she came in and claimed that she had these medical expenses for her sister, she never produced any records of payment. She never verified her response. This woman is pretty sophisticated, I feel, even in representing herself before the circuit court. As to the reconstruction costs, I just believe that under quantum merriment and a rescission-type theory that these costs, he had to change the two units, or the one unit back to one because he had to remove, everybody that came in and looked at it, they said they liked the space, but they didn't like the kosher kitchen set up and they didn't like the gray marble and the gray color scheme in the bathroom. So those had to go. He tried for a year and a half to two years to sell it. He couldn't. This was back when the real estate market was pretty hot and going pretty strong. And, in fact, once he separated the two, he sold one of the two apartments. One still remains unsold. So we just like to, for these reasons, we respectfully request that the judgment entered by Judge Barkowitz be affirmed. Thank you, Mr. Chairman. Mr. Ryan Brinkley? I'm sorry, one more question. Mr. Chair? You had three theories under which the reconstruction. Right. One is the contractual one? Yes. Explain that a little bit to me. Well, I cited one case in here. I can't remember exactly what it is right now, but I can give it to you later. It's in the brief. There were reconstruction costs allowed to actually get to what the party, the buyer, had contracted for. They had to tear out and repair work that apparently the first contractor had done. Thank you. Thank you. Mr. Ryan Brinkley? I understand the idea that you do the right thing. Unfortunately, in some cases, the world turns over and people are caught in changes in the economy. All sorts of things happen to them. You have people in the circuit court who can't pay their rent for not their own fault, but the court still goes to trouble with the law. Right? This is somebody who chose to buy a double condo unit while owning another huge condo unit while living in a third condo unit. Right. And was unable to sell it. She's trying to sell it. And, again, we just know this to be true. We're still stuck with the record. What did Judge Barker say about that? He didn't seem to care much about that. Right? On either side, he didn't say, oh, it's terrible. She should bear the burden. He didn't talk like that. He just said, well, I'm going to give it to $45,000. No, but what he should have done is follow the law that specifically says that a judge does not have authority to change the terms of the contract. Even if circumstances change, the contract is binding on the parties. And under the rule of law, and not the rule of a particular person's view of what is just under these circumstances, that is what should have been enforced. What the contract, which both parties voluntarily entered into, negotiated and signed, that is what Judge Barkowitz should have imposed on the parties. As far as some of the costs in terms of there was some discussion about gray marble. And if you look at the brief of Belmont Harbor at page 19 and 20, you see that the purchaser of the unit later on demanded that the gray marble be removed. And that's in their brief. They could have recouped the cost of that by saying to the potential purchaser, you want the gray marble removed? There's a cost for that. You'll have to pay the cost. And if you look at the one unit that was sold. I don't know much about real estate. I've only bought each house I ever lived in. I've never bought a separate piece of property because I don't believe in it. I think it's risk. I'm averse to risk. But I think if he were to sell, and Mr. McCauley knows very well how to sell these places. If he were to tell the buyer that he didn't like the gray marble, well, if you give me the few thousand dollars, I can change it for you. Maybe the buyer would walk out the door. So your suggestion, Mr. McCauley, would be do you know how to sell these things? If you look at the court record, though, that unit sold for $630, I believe it was $8,000. The original contract price that was considered when Ms. Goldberg signed her contract, and this is set out in the contract, was $6,008 plus $10,000 for a parking space. It's very clear that there was some uproar. So McCauley's fortunate. He came out and had $20,000 by that math. That's good. In fact, he's supposed to swallow the thing for seven years, the empty place. We're hitting seven years yet on the empty condo, five years. That's a risk that he took when he signed the contract. Or it's a risk he took when he agreed with Ms. Goldberg to build this thing the way she asked. Correct. And as Your Honor pointed out, he could have put that risk on her by negotiating different terms into the contract to protect himself from that risk. He chose not to. And so he bears that risk under the contract law, not the law decided by one particular judge, but the law that has been developed over multiple decisions. There was some discussion at the end about the case about reimbursement for tearing down property. I'm not sure if Mr. Scheer was referring to the case of Brewer Custom Builders Corp., 42 Illinois, Appellate 3rd, 668. But if you look at that case, there was an issue about whether costs of reconstruction should be done. And the court decided ultimately that you have to look at what the cost of reconstruction is compared to the value. And you don't force someone to pay for reconstruction if it is substantial and you look at the value. That, again, was a... That does make sense, especially in a water damage thing, some disaster happens. I want to rebuild my house just the way it was. That makes a lot of sense. It doesn't make sense to suggest, I think, counsel, under that legal theory, that when you have two condo units, put them together at the request of the buyer, that falls through for probably nobody's fault, then that he won't split them up. He tried for a year and a half. So he lost every penny on that that he would normally be able to make by selling these two condos. He lost all that for a year and a half. So he had to split them up, and one was successful. So to suggest that somehow we should say, well, reconstruction under that theory, that it's just too expensive to charge somebody, that is no application here, I suggest, counsel. Anything else? No. I will stand on what I've said unless the court has any further questions. Mr. Tillman, I want to thank you for your briefs. I mean that. I want to thank you for your oral arguments. And in this case, it will be taken under advisement, and this court will be adjourned.